# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**GLENN SCOTT FANNIN,**

**Plaintiff,**

**-vs-**                                              Case No.  6:07-cv-1315-Orl-DAB

**UNITED SPACE ALLIANCE, L.L.C.,**
**d/b/a:  USA, and ZARAH P. SHAW,**

**Defendants.**

_____

## ORDER ON SUMMARY JUDGMENT

This cause came on for consideration without oral argument on the following motions filed

herein:

> **MOTION:** **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
> **(Doc. No. 93)**
>
> **FILED:** **October 10, 2008**
> _____
>
> **THEREON** it is **ORDERED** that the motion is **GRANTED** in part and
> **DENIED** in part.
>
> **MOTION:** **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
> **(Doc. No. 95)**
>
> **FILED:** **October 10, 2008**
> _____
>
> **THEREON** it is **ORDERED** that the motion is **GRANTED** in part and
> **DENIED** in part..

On August 21, 2007, Plaintiff Glenn Fannin filed this Complaint against his former employer,

Defendant United Space Alliance, LLC ("USA"), and his former manager, Defendant Z.P. Shaw, for

violations of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C.

§ 4301 *et seq.* ("USERRA")[1]. Doc. No. 1, 33. Plaintiff alleges that Defendants failed to provide him with merit raises and certain other benefits during his military leave, failed to immediately return him to his pre-leave position when he returned from leave, and harassed, discriminated, and retaliated against him in other ways after he demanded reinstatement to his prior position. Doc. Nos. 95, 105. Plaintiff moves for summary judgment on his claims[2]. Defendants cross-move for summary judgment, arguing that not only has Plaintiff failed to meet his burden to prove that the cited actions constituted adverse employment actions as required under USERRA, as a matter of law the actions were not adverse or motivated by discriminatory animus, and they are entitled to summary judgment. For the reasons set forth below, the Court finds each party is entitled to summary judgment on various claims, but genuine issues of material fact remain for certain claims.

# I. BACKGROUND FACTS[3]

USA is the prime contractor to the National Aeronautics and Space Administration ("NASA") for the operation of the space shuttle program, and is responsible for a broad range of technical and support functions to prepare the shuttle for launch. Doc. No. 94-4 at 37-53, Sledge Decl. ¶ 2. Plaintiff began working for USA's predecessor as a lead electronic shuttle technician in 1996, and transferred to a Pad Leader position in 1998. Doc. No. 94-4 at 37-53, Sledge Decl. ¶3. Neither position involved management duties. Fannin Dep. 2, Doc. No. 94-5 at 23-33 (Dep. at 49). Prior to his employment

---

[1]Although Plaintiff asserted claims in the Amended Complaint (Doc. No. 33 ¶¶ 28, 29) for violation of the Florida Uniformed Servicemembers Protection Act ("FUSPA"), Fla. Stat. § 250.80 et seq., the Act does not provide any employment rights to private sector employees – only public sector employees. See Fla. Laws Ch. 2003-72. Neither USA nor Shaw is a public employer. Plaintiff fails to assert any argument whatsoever concerning the FUSPA; thus, Defendants are entitled to summary judgment on Fannin's FUSPA claims.

[2]Plaintiff filed a motion for summary judgment despite his argument that "there remain genuine issues of material facts in dispute regarding Plaintiff's claim." Doc. No. 105 at 2.

[3]The Background Facts are either undisputed or read in the light most favorable to the non-moving party, as they must be on summary judgment. *See Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) ("Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case.").

with USA, Plaintiff served as an active duty noncommissioned officer in the U.S. Air Force. Doc. No. 33 ¶ 7, Am. Compl. Upon the completion of his active duty service, in 1989, Plaintiff continued his military service as a reservist non-commissioned officer with the Florida Air National Guard; he received his commission as an officer in 1996. Doc. No. 33 ¶ 7, Am. Compl. In August 2001, USA promoted Plaintiff to second shift Manager I in Orbiter Operations Quality Assurance ("Manager I"); Plaintiff had approximately forty-two subordinates reporting directly to him. Doc. No. 105-1, Fannin Decl.

One month later, in September 2001, Plaintiff received active duty orders to serve at the Jacksonville International Airport in Jacksonville, Florida. Doc. No. 94-5 at 45-50, Fannin Dep. 3 at 21, 50. During Fannin's two-year military leave, USA needed someone to take over his Manager I duties. Doc. No. 94-4 at 7-16, Muldowney Decl. ¶6. To open a Manager I slot, USA reclassified Plaintiff as an Ops & Processing Staff V ("Staff V Position") – a lateral move – on January 8, 2002. Doc. No. 105-3; Doc. No. 94-4 at 37-53, Sledge Decl. ¶ 6. The Staff V position was the same pay grade as the Manager I position, without any change in pay. Doc. No. 94-4 at 37-53, Sledge Decl. ¶6. Ralph Shivel, who had previously served as a Manager I in Quality Assurance, was selected to take over the Manager I position. Doc. No. 94-4 at 7-16, Muldowney Decl. ¶7.

In late August 2003, Plaintiff was honorably discharged from active duty service and requested return to employment with USA. Fannin Dep. 1 at 9-10. Upon his return from active duty Plaintiff was reinstated to the Staff V Position, not to the Manager I Position on the second shift. Doc. No. 35 ¶ 18; Doc. No. 105-2, Fannin Decl. ¶ 16. In the Staff Position, Plaintiff had no subordinates reporting to him. Doc. No. 105-2, Fannin Decl. ¶ 17. During his military leave, Plaintiff received no merit pay increases. Doc. No. 105-2, Fannin Decl. ¶ 17. After his return from leave, Plaintiff received evaluations based upon a thirteen-month period instead of a twelve-month period, and he was directed

to work in a different office space[4] than the one he had before his deployment. Doc. No. 105-2, Fannin Decl. ¶ 17.

In November 2003, Plaintiff complained to the Employer Support of the Guard and Reserve ("ESGR"), and threatened to sue USA for violations of the USERRA, for USA's failure to return him to the Manager I position. Doc. No. 105-2, Fannin Decl. ¶ 18-19. On December 6, 2003, USA reinstated Plaintiff to the second shift Manager I position. Doc. No. 94-4 at 68-71, Ashwell Dep. at 54. In order to reinstate Plaintiff to the second shift Manager I position it was necessary for Shaw to remove another employee, Ralph Shivel, from that Manager I position in December 2003. Shaw Dep., Doc. No. 95-5 at 65.

Prior to Plaintiff's military deployment, Plaintiff received marks of "3 (meets expectations)" or better in every evaluated category. Doc. No. 105-2, Fannin Decl. ¶ 21. Following his return to USA and complaints leading to reinstatement, Plaintiff subsequently received from Shaw a mark of "2 (partially meets expectations)" on a 2004 performance evaluation and a Formal Warning in March 2007. Doc. No. 105-2, Fannin Decl. ¶¶ 22, 24.

Fannin went on a medical leave of absence on May 8, 2007. Sledge Decl. ¶12. Under USA's Leave of Absence policy, medical leaves of absence may extend a maximum of 12 months; employees who fail to return from a medical leave of absence after 12 months are considered to have voluntarily resigned. Doc. No. 94-4 at 37-53, Sledge Decl. ¶¶ 12, 13, Ex. 1, 2. Plaintiff remained on medical leave until his termination from employment on May 7, 2008. Doc. No. 94-4 at 37-53, Sledge Decl. ¶12; Doc. No. 94-6 at 1-20, Fannin Dep. 4 (Dep. at 34). Fannin's doctor submitted a note that stated that Plaintiff was not able to return to work. Doc. No. 94-4 at 37-53, Sledge Decl. ¶16, Ex. 4; Doc.

---

[4]Plaintiff also alleges that he was instead directed to work in what he characterizes as "known unsanitary" work conditions. Doc. No. 105-2, Fannin Decl. ¶ 24.

No. 94-6 at 1-20, Fannin Dep. 4 (Dep. at 35). Plaintiff filed this suit against the Defendants on August 21, 2007, asserting claims against Defendants for violation of the USERRA.  Doc. No. 1.

## II. MOTIONS FOR SUMMARY JUDGMENT

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the

proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal,* 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Id.* at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Id.* at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *WSB-TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir. 1988). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 248 (emphasis in original).

The Rule 56 standard is not affected by the filing of cross motions for summary judgment: "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 335-36 (3d ed.1998). Cross-motions may, however, be probative of the absence of a factual dispute where they

reflect general agreement by the parties as to the controlling legal theories and material facts. *See United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984).

## III. RELIEF UNDER THE USERRA

The Uniformed Services Employment and Reemployment Rights Act was enacted to "prohibit employment discrimination on the basis of military service" and to provide "prompt reemployment" to individuals engaged in non-career military service. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301). Because the purpose of USERRA is "to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312-13 (4th Cir. 2001). USERRA's right to re-employment encompasses two guarantees that are embodied in §§ 4312 and 4313. Under § 4312, returning military personnel who (a) gave advance notice of military leave to their employer; (b) were on a military leave of less than five years; and (c) submitted a timely request for reemployment "shall be entitled" to reemployment. 38 U.S.C. § 4312. Section 4313 sets forth the position of employment to which the returning veteran must be rehired and requires that the veteran be "promptly reemployed" in that position. *See Petty v. Metropolitan Government of Nashville-Davidson County*, 538 F.3d 431, 440 (6th Cir. 2008) (employer violated USERRA in not reemploying veteran promptly during three-week unpaid period during which he was tested for fitness to return to work as a police officer).

A different section of USERRA "prohibits employers from discriminating against employees on the basis of military service." 38 U.S.C. § 4311. A violation occurs when a person's military service is a "motivating factor" in the discriminatory action, even if not the sole factor. 38 U.S.C. § 4311(c)(1). Under § 4311, plaintiff bears the initial burden of showing by a preponderance of the evidence that (1) the defendant has denied him "initial employment, reemployment, retention in

employment, promotion, or any other benefit of employment," and (2) plaintiff's military service was

"'a substantial or motivating factor' in the adverse employment action." *Sheehan v. Dep't of the*

*Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (cited with approval in *Coffman v. Chugach Support*

*Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301)). The USERRA provides

that, even if prohibited discrimination was a factor, the employer does not violate the statute if "the

employer can prove that the action would have been taken in the absence of [military status]." 38

U.S.C. § 4311(c)(1). Plaintiff also alleges USA retaliated against him for exercising his rights under

the USERRA. An employer may not discriminate in employment or take adverse employment action

against any person because such person has taken an action to enforce a protection afforded any

person under the USERRA or has exercised a right provided for in the USERRA. 38 U.S.C. §

4311(b).

## IV. ANALYSIS

Defendants move for summary judgment on Plaintiff's USERRA-violation claims focused on

specific conduct that Defendants allegedly took against Plaintiff (Doc. No. 93). Because Plaintiff did

not specifically oppose the granting of summary judgment on these specific incidents in his

Opposition Memorandum (Doc. No. 105) or in his cross-Motion for Summary Judgment (Doc. No.

95), Defendants are entitled to summary judgment on claims that the following actions were

discriminatory or violated the USERRA: USA's failure to buy back Plaintiff's vacation benefits;

USA's charging Plaintiff for medical plan costs while he was on military leave; and USA's failure

to move Plaintiff to a lateral position[5] or to select him over other candidates for specific Manager II

_____

[5]Moreover, the Court agrees with Defendants' argument that the denial of a transfer to a lateral position on the facts of this case would not constitute an adverse employment action. *See, e.g., McGowan v. City of Eufala*, 472 F.3d 736, 742-43 (10th Cir. 2006); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Reis v. Universal City Dev. Partners*, 442 F. Supp. 2d 1238, 1253-54 (M.D. Fla. 2006).

positions[6]. Defendants are also entitled to summary judgment on Plaintiff's claims that the following actions constituted actionable discrimination in violation of the USERRA: Shaw's failure to keep Plaintiff informed of departmental issues and non-responsiveness to his queries; Shaw's failure to notify him of meeting cancellations; Defendants' attempts to move him to first shift for mentoring and coaching; Defendants' delays in delivering his paychecks; failure to allow Plaintiff to participate in the Green Belt Training program while he remained a manager, and Defendants' failure to give Plaintiff a departmental mailbox until three months after his return.

Plaintiff has focused his claims on five specific categories of actions taken by Defendants, on which he contends he is entitled to summary judgment (Doc. No. 95), or at the very least, on which there remain genuine issues of material fact that preclude summary judgment for Defendants. Doc. No. 105. Plaintiff argues that Defendants violated 38 U.S.C. §4311 and 4312 specifically: 1) by providing unwarranted, low evaluations of Plaintiff's performance in his employment position in 2004; 2) by providing Plaintiff with a Formal Warning in 2007; 3) by placing Plaintiff in an employment position with less seniority and status on his return to a Staff V Position, rather than re-employing him as a Manager I or Manager II; and 4) by knowingly placing Plaintiff in unsanitary work spaces. Doc. No. 95. Fifth, Plaintiff also alleges that he left his job at USA in 2007 as a "direct result" of Defendants' "intentional harassment and discrimination." Doc. No. 95 at 2.

Defendants argue that the discipline and lower performance rating for Plaintiff was based on non-discriminatory reasons; that Plaintiff was re-employed at the same rate of pay as a Manager I, the position he was in when he went on military leave and he was not entitled to a promotion to Manager II; and the changes in his office space were not adverse employment actions. Defendants also argue

---

[6]Plaintiff also makes a separate argument that he should have been promoted to a Manager II position as an "escalator" position under § 4312 of the USERRA, which is discussed separately and in detail *supra*.

that Plaintiff has provided no evidence that the single 2004 performance appraisal "2" score, the 2007 Formal Warning, or his office assignments were impermissibly motivated or had a material adverse impact on his employment in any way.

The Court considers each argument in turn and for the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part and Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part**.**

### A. Section 4312 - Right to reemployment in a position of like seniority, status, and pay

Plaintiff contends that he is entitled to summary judgment that USA should have immediately reemployed him in the Manager I Position, and should not have reassigned him to a Staff V Position, delaying for three months his reassignment to the Manager I Position. Plaintiff also argues that he is entitled to summary judgment because, rather than being returned merely to his prior Manager I Position, under the escalator principle, USA should have reemployed him in a higher-level Manager II position that he would have attained in the two years had he not been on military leave. Defendants respond that Plaintiff's entitlement to promotion to Manager II was far from the "reasonable certainty" as required by USERRA and Plaintiff's complaints about delayed placement in the Manager I position are moot because Plaintiff did not lose any pay.

In order to prove a claim under § 4312, Plaintiff must show that he has fulfilled the procedural requirements of § 4312 and that the defendant's offered position violated the requirements of § 4313. In this case, the parties do not dispute that Plaintiff complied with the procedural requirements of § 4312 and was entitled to reemployment; rather, the parties dispute whether Plaintiff was placed into an appropriate escalator position, *i.e.*, one of "like seniority, status, and pay." A key provision of USERRA's reemployment protections is the "escalator principle," which "requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and

-10-

other job perquisites, that he or she would have attained if not for the period of [military] service." 20 C.F.R. § 1002.191. However, an employer is permitted to take into consideration changes in the workplace during an employee's period of military leave. The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification he would have held if he had been employed during his period of military service. See 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.").

### 1. Delayed reemployment in Manager I Position

Plaintiff contends that he is entitled to summary judgment on his claims that his initial reemployment in a Staff V position rather than as a Manager I, from August 2003 to December 2003, violated USERRA. The "[b]urden of proving that a returning veteran is not qualified for reemployment falls on the employer, not on the employee." 38 U.S.C.A. § 4313; *Petty v. Metropolitan Government of Ashville-Davidson County*, 538 F.3d 431, 444 (6th Cir. 2008). Thus, it is Defendants' burden to prove that Plaintiff was not qualified to be returned to the Manager I Position. Defendants concede that USA failed to properly place Plaintiff in a Manager I position for the initial three months of his reemployment. *See* Doc. No. 106 at 19 n.11.

There is no dispute that the Staff V Position was the same pay grade as the Manager I position, without any change in pay. Doc. No. 94-4 at 37-53, Sledge Decl. ¶6. Because Plaintiff was immediately reemployed at the same rate of pay in both positions, the facts of *Petty v. Metropolitan Government of Nashville-Davidson County,* cited by Plaintiff, are distinguishable. The Plaintiff in *Petty* did not receive *any* salary or benefits for the three-week period of examination between

February 28, 2005 and March 21, 2005 because he was required to first pass a test to certify he was fit to return to duty as a police officer. 538 F.3d 431, 436 (6th Cir. 2008). In this case, Plaintiff received the same pay, albeit in a Staff V Position, and Defendants argue that the positions were equivalent for that reason. However, the rate of pay is not the sole factor the Court is required to consider.

The Court is to consider six factors in evaluating if an offered position for reemployment is of like status: (1) opportunities for advancement (2) general working conditions (3) job location (4) shift assignment (5) rank and (6) responsibility. 20 C.F.R. § 1002.194. The Court must also consider whether seniority is the same. 20 C.F.R. § 1002.193. In this case, differences in certain factors of the Manager I and Staff V positions, such as job location, general working conditions[7], and shift assignment either remained unchanged or there is no evidence pointed out by Plaintiff in the record showing they had changed. However, the Court finds that there was a significant difference in the rank and responsibility, as well as the advancement opportunities, between the Manager I and Staff V Positions.

It is undisputed that, prior to his military deployment when employed as a Manager I, Plaintiff had forty-two subordinates reporting to him. In the Staff V Position, Plaintiff had no subordinates reporting to him, and his opportunities for managerial advancement, without the experience of managing subordinates, would unquestionably be diminished. *See, e.g.*, *Hackett v. State of Minn.*, No. 3-90-0476, 1991 WL 323413, *2 (D. Minn. 1991) (employer violated the USERRA where veteran was reemployed, not in his former management position, but in a position without any subordinates, no supervisory or managerial responsibility he had previously, and the new position did not appear

---

[7]The Court addresses Plaintiff's arguments regarding "unsanitary" office space – which Plaintiff has arguably raised as a "working condition" – separately below. There is no evidence that these conditions were related to being reemployed in a Staff V Position.

to have similar opportunities for advancement as former position). The Court finds that Plaintiff is entitled to summary judgment on his claim that his reemployment for three months, from August 2003 to December 2003, at the Staff V Position[8] violated § 4312. On this issue of Plaintiff's delayed reemployment as a Manager I, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED**.

However, as Defendants point out, Fannin suffered no lost wages during the three-month period in dispute; he received the same pay and monetary benefits that he would have received in a Manager I position. Doc. No. 94-4 at 37-53, Sledge Decl. ¶¶ 6-7. Plaintiff's remedies under the USERRA are limited to compensatory damages for lost wages or benefits, and liquidated damages. *See* 38 U.S.C. § 4323(d)[9]. Thus, there remains the issue as to whether Plaintiff is entitled to *any* damages as a result of the three-month delay in returning him to the Manager I Position. *See, e.g., Maher v. City of Chicago*, 406 F. Supp.2d 1006, 1027 (N.D. Ill. 2006) (where reservist was ultimately reinstated to his former position, and apparently suffered no financial damage as a consequence of any delay in reinstatement, "the chief utility" of the incident was "its evidentiary value in the overall mix of claimed misconduct"), *aff'd*, 547 F.3d 817 (7th Cir. Oct. 31, 2008).

### 2. *Reemployment in an escalated position of Manager II*

Plaintiff contends that he is entitled to summary judgment on the issue that he should have been reemployed by USA as a Manager II, which Plaintiff contends is the "escalator position" to which he would have progressed in two years time had he not been called to military duty. Doc. No. 95 at 7. The Supreme Court has held that, under USERRA, the employers' obligation to rehire means "the

---

[8]Although Plaintiff contends that he was placed in a "diminished capacity" position shortly after his military leave began, Plaintiff has failed to argue or cite any authority in support that USA's actions *before* he was entitled to reemployment violated the USERRA.

[9]Injunctive relief is also available, but inasmuch as Plaintiff was reinstated to Manager I in December 2003, prior to filing the lawsuit, this remedy is not available.

returning veteran should step back onto the seniority escalator" at the "precise point he would have occupied had he kept his position continuously during the [military deployment]." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284-85 (1946).

USERRA's regulations explain that this "escalator position" means that "the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service," *i.e.*, reemploying the servicemember "in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service," 20 C.F.R. § 1002.191. The Supreme Court has described the escalator principle as protecting a servicemember "against receiving a job inferior to that which he had before entering the armed services," *Fishgold*, 328 U.S. at 284.

Defendants contend that there is no possibility, and definitely not a "reasonable certainty," that Fannin would have attained a promotion to Manager II during his military leave. It is undisputed that USA has no automatic promotion at the managerial levels. *See* Doc. No. 94-4 at 37-53, Sledge Decl. ¶ 11. Additionally, between September 2001 and August 2003 (when Plaintiff was on military leave), USA did not promote *any* Manager I's in the Orbiter Operations Quality Assurance organization to Manager II. *See* Doc. No. 106-4, Ainsworth Decl. ¶ 3. The only promotion from Manager I to Manager II between September 2001 and 2008 was of Defendant Shaw who had seven years of quality assurance experience as a manager at the time he was selected for the Manager II position in December 2003. Doc. No. 106-4, Ainsworth Decl. ¶ 4; Doc. No. 94-4 at 37-53, Sledge Decl. ¶ 11.

As Defendants cite from applicable cases: "If a promotion is at least partially dependent on the employer's discretionary determination of fitness and ability, the Act does not accord the veteran a right to an automatic promotion." *Goggin v. St. Louis*, 702 F.2d 698, 701 (8th Cir. 1983); *accord McKinney v. Missouri-Kansas-Texas R.R. Co.*, 357 U.S. 265, 272 (1958) ("[O]n application for

re-employment a veteran is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer.").

Plaintiff in effect argues that he was entitled to a promotion from Manager I – a position he held for only one month before his military leave began – to Manager II upon reemployment. Plaintiff argues that had Plaintiff "not been involuntarily deployed in September 2001, he would have, in all probability, progressed to a Manager II position based upon his unblemished employment history at USA" and "the fact that individuals were promoted to Manager II while [Plaintiff] was deployed on military duty." Doc. No. 95 at 20. However, Plaintiff fails to point to evidence of the other individuals who were promoted to controvert Defendants' evidence that *none* in Plaintiff's group were promoted during his deployment. Moreover, Plaintiff has failed to show with "reasonable certainty" that he "would have attained" the promotion to Manager II during his two year absence, if not for the military leave. On the issue of Plaintiff's reemployment as a Manager II, Plaintiff's Motion for Summary Judgment is **DENIED,** and Defendants' Motion for Summary Judgment is **GRANTED**.

### 3. Merit Pay

Plaintiff mentions in passing (Doc. No. 95 at 7, 22) the issue of Defendants' failure to provide him with merit raises during the time he was on military leave, allegedly in violation of the USERRA. The USERRA does not grant escalator protection to service members' non-seniority rights and benefits but provides only that the employer treat employees absent because of military service equally with employees having similar seniority, status, and pay who are on comparable non-military leaves of absence under a contract, agreement, policy, practice, or plan in effect at anytime during that uniformed service. § 4316(b)(1). *See Rogers v. City of San Antonio*, 392 F.3d 758, 764 (5th Cir. 2004) (reservists were not entitled to lost straight-time, lost overtime or missed upgrades attributable to their

absences since there was no type of non-military leave available to any city employee under which employee could accrue those kinds of benefits).

Defendants seek summary judgment on this issue, arguing that Plaintiff received appropriate merit raises based on his performance (3.5% pay raise in the 2002 salary plan based on his 2001 performance) and was appropriately denied performance-based merit raises for the next two years when he was on military leave (during the entire 2002 and 2003 performance periods). Doc. No. 94-4 at 7-16, Muldowney Decl. ¶ 4-5. Defendants contend that, because USA's raises are performance-based, and depend on an employee's individual performance compared to his/her peers, any USA employee who is absent on any kind of leave of absence for all or most of the review period is ineligible for a raise in the subsequent year's salary plan. Doc. No. 94-2 at 10-19, Ashwell Decl. ¶ 5. In the 2003 salary plan, five Manager I's (not on leave) in addition to Plaintiff received no merit-based raises. Doc. No. 94-2 at 10-19, Ashwell Decl. ¶ 6. Plaintiff's dearth of evidence on the issue of his entitlement to merit-based pay raises dooms his claim; Plaintiff's Motion for Summary Judgment as to this issue is **DENIED**. Defendants' Motion for Summary Judgement on this issue is **GRANTED**.

## B. Section § 4211 – Discrimination against servicemembers

Plaintiff contends that Defendants discriminated and retaliated against him because of his military service. To succeed under § 4211, Plaintiff must prove, by a preponderance of the evidence, that his military service motivated the denial of employment benefits. *Sheehan v. Dept. of Navy*, 240 F.3d 1009 (Fed. Cir. 2001). The allocation of burdens is included in the statute and differs from the *McDonnell Douglas* framework:

> An employer shall be considered to have engaged in actions prohibited . . . if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

-16-

38 U.S.C.A. § 4311(c)(1).  This procedural framework is different from *McDonnell Douglas*, because while allocating the burden of production of evidence, "it does not shift the burden of persuasion to the employer."  *Sheehan*, 240 F.3d at 1014.  The burden-shifting framework applied in *Sheehan* is the method used to discern whether an employer was, in fact, motivated by the employee's military status when he or she was denied the benefit of employment.  *Sheehan*, 240 F.3d at 1014 (quoted in *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005); *see also Sanguinetti v. United Parcel Service, Inc.*, 114 F.Supp.2d 1313 (S.D. Fla.2000), *aff'd*, 254 F.3d 75 (11th Cir. 2001) (table).

This technique mandates that the plaintiff first must show by a preponderance of the evidence that military status was a motivating factor in the employer's decision to discharge or adversely affect an employee. *Coffman*, 411 F. 3d at 1238. "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* (quoting *Sheehan*, 240 F.3d at 1014).  The burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.*

Plaintiff alleges that USA also retaliated against him for exercising his rights under the USERRA.  Under § 4311(b) of USERRA, an employer may not discriminate in employment or take adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under the USERRA or has exercised a right provided for in the USERRA.  38 U.S.C. § 4311(b). An employer is in violation of § 4311(b), if the person's action to enforce a protection afforded any person under the USERRA or exercise of a right provided for in the

USERRA, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such a person's enforcement action, testimony, statement, assistance, participation, or exercise of a right. 38 U.S.C. § 4311(c)(2).

1. *Negative Performance Action in 2004*

Plaintiff alleges that Shaw's resentment for having to remove Ralph Shivel from the Manager I position and replace him with Plaintiff caused him to discriminate and/or retaliate against Plaintiff. Defendants contend that they are entitled to summary judgment because there is no evidence that Plaintiff's military service was a motivating factor in any adverse employment action; even so, the record evidence shows that Defendants would have made the same decisions under the circumstances. Doc. No. 93 at 18.

Plaintiff contends that Shaw discriminated against Plaintiff because he was displeased that he was forced to "bump" Shivel from the second shift Manager I position to reinstate Plaintiff. Plaintiff points to Shaw's deposition testimony that Ralph Shivel was a respected fellow employee of USA since 1979 and that Shaw and Ralph Shivel had developed a personal relationship over the years. Doc. No. 95-6, Shaw Dep. at 79. Shaw described Ralph Shivel as "an incredible father" who had "dedicated his life" to his special needs child. Doc. No. 95-5, Shaw Dep. at 17. Shaw and Ralph Shivel initiated a social relationship the early 80's which included their respective families and visits to each other's homes (three times in the last eight to nine years), as well as three golf outings. Doc. No. 95-5, Shaw Dep. at 22-24, 34. When Shaw was promoted in 2003 to a Manager II position, he became Ralph Shivel's direct supervisor but later became responsible for personally removing Shivel from the Manager I position at his employer's direction. Doc. No. 95-5, Shaw Dep. at 46. Plaintiff alleges that when Shaw informed Plaintiff that he would be returning to the Manager I position, Shaw

stated, "come in, close the door, HR told me to tell you you've got your job back and get out, that's it." Doc. No. 95-31, Fannin Dep. at 131.

Plaintiff alleges that following Shaw's displacement of Shivel, in December 2003, Plaintiff received two problematic performance evaluations, compared to those received before his deployment. Prior to his deployment, Plaintiff received evaluations which were marked as "3" or "meets expectations" or above. In Shaw's first evaluation of Fannin upon his return to work at USA following his military deployment, Shaw gave Fannin a mark of "partially meets expectations" or "2" in Communications (Verbal and Written). Doc. No. 95, Ex. E, Shaw's 2004 evaluation of Fannin. Plaintiff contends that the "career-ending" low mark of "2" has not been substantiated by the Defendants by any form of evidence or documentation and the low score was "effectively disproven" by later evaluations as well as the testimony of fellow employees. Doc. No. 95. Plaintiff points to Defendant Shaw's deposition testimony that the mark of "2" on Plaintiff's 2004 performance review reflected Plaintiff's low level of "communication skills." Doc. No. 95-6 at 34-35, Shaw Dep. at 107-08.

Defendants contends that the "2" awarded by Shaw was based on the feedback he received from Plaintiff's quality inspectors and his own perception of Fannin's management deficiencies. Defendants argue that Shaw received complaints from Fannin's quality inspectors that Plaintiff was unavailable when they needed him, that he would call them outside for counseling while he smoked, and that he lacked basic people skills, and commanded the inspectors without consideration for their input or experience. Doc. No. 94-4 at 26-36, Shaw Decl. ¶3. Moreover, Shaw thought that Fannin, as a new manager with no prior experience in quality assurance, lacked initiative and competence in getting even simple issues resolved (such as arranging to have his telephone line moved to another

office). Doc. No. 94-4 at 26-36, Shaw Decl. ¶4. Defendants point to Fannin's overall performance

score, which

was a 2.9 for 2004, and Plaintiff was allocated a 4.001% pay raise in the 2005 salary plan. Doc. No.

94-2 at 2-7, Ainsworth Decl. ¶5. In 2005, Fannin's performance score was 3.2. Doc. No. 94-5, Fannin

Dep. 2 at 45, Ex. 9. Defendants also argue that Plaintiff could not have been discriminated against

because other Manager I's under Shaw's supervision with better performance scores often received

pay raises equal to or lower than Fannin's raises. Doc. No. 94-2 at 2-7, Ainsworth Decl. ¶6.

The Court finds that a genuine issue of material fact exists as to Defendants' motivation in

assessing Plaintiff with a "2" on the first Performance Review completed following Plaintiff's

insistence that he be returned to the Manager I position and his exercise of his rights under the

USERRA. Under the facts in the record thus far, it is not Plaintiff's status as a service member that

is the root of the discrimination Plaintiff alleges, it is Plaintiff's exercise of his rights under the

USERRA in demanding to be returned to a Manager I Position which allegedly brought about

Defendants' discrimination and/or retaliation.

2. *Negative Performance Action in 2007 – the Formal Warning*

Plaintiff contends that a Formal Warning issued to Plaintiff on March 6, 2007 – advising him

of his "unacceptable performance as a member of management"(Doc. No. 95-14) – was motivated by

Shaw's discriminatory animus toward Plaintiff. Plaintiff contends that the lack of a counseling session

before being issued the Formal Warning and its citation of issues first raised in the 2004 Performance

Review reflect that animus.

Defendants contend that Shaw issued Plaintiff the Formal Warning based on the complaints

of Plaintiff's staff and the investigation by Human Resources verifying those complaints. In 2006,

Fannin was tasked with getting three of his quality inspectors who regularly worked at the Hypergol

Maintenance Facility – David Day, Herminio Morales, and Williams Pickens – cross-trained to assist in the Thermal Protective Services ("TPS") area, to alleviate a backlog in gap-fillers (used to fill small spaces between the protective tiles on NASA's shuttles). Doc. No. 94-5 at 1-22, Fannin Dep. 1 at 65-66. In August 2006, because the three inspectors had failed to obtain their complete TPS certifications, Fannin directed them up to his office for a meeting. Doc. No. 94-5 at 1-22, Fannin Dep. 1 at 67-69. These inspectors testified that, at the beginning of this meeting, Fannin closed the door to his office, turned on his television and turned up the volume, and stated that he turned it up in case any of the inspectors had a listening device on them; then he instructed the inspectors not to talk. Doc. No 94-6: Day Dep. Ex. 1; Mora. Dep. Ex. 1; Pick. Dep. Ex. 1. Fannin's testimony was the comments were made jokingly. Doc. No. 94-5 at 23-33, Fannin. Dep. 2 at 18. According to Defendants, Fannin then lectured the inspectors in front of each other, accusing them of resisting the TPS cross-training, and threatening their jobs if they continued to delay in obtaining their certifications; when one of them attempted to respond and ask questions, Fannin again stated that he was not allowed to speak. Doc. No 94-6: Day Dep. Ex. 1; Mora. Dep. Ex. 1; Pick. Dep. Ex. 1. Defendants contend that none of the employees immediately reported Fannin's behavior to Shaw because they were intimidated and worried about retaliation by Fannin if they reported his behavior, and Fannin gave them the impression that Shaw knew what Fannin was doing. Doc. No 94-6: Day Dep. Ex. 1; Mora. Dep. Ex. 1; Pick. Dep. Ex. 1.

According to Defendants, several months later, in early 2007, Shaw learned of the incident, and asked Human Resources to investigate. Doc. No. 94-6 at 44-52, Shaw Dep. at 123, 138. Michael Sledge, an H.R. representative, interviewed the three employees and Fannin, and asked the employees to submit written statements of their recollections. Doc. No. 94-4 at 37-53, Sledge Decl. ¶8; Doc. No. 94-5 at 23-33, Fannin Dep. 2 at 17-18. During his investigation, Sledge also learned that, in a group

meeting, Fannin confronted his inspectors with negative feedback some of them submitted during USA's anonymous "multiple input review" process (in which subordinate employees can submit feedback on their managers). Doc. No. 94-4 at 37-53, Sledge Decl. ¶9. Based on the employees' statements, Sledge determined that Fannin's behavior during both meetings was inappropriate. Doc. No. 94-4 at 37-53, Sledge Decl. ¶10. After Sledge reported the results of his investigation to Shaw, Shaw prepared a letter advising Fannin that his recent behavior was unacceptable. Doc. No. 94-6 at 44-52, Shaw Dep. 136-37; Doc. No. 95-14. Defendants contend that "no other action was taken based on the letter, and Fannin lost no pay or benefits," and they would have taken the same actions regardless of Plaintiff's military status based on the inspectors' complaints.

Plaintiff's argument is that, in light of Shaw's view of Plaintiff's communication deficiencies in 2004 and 2007, and despite USA's policy that managers must meet with employees regarding their performance and yearly evaluations, no meeting, discussion or counseling sessions took place between Shaw and Plaintiff prior to the Shaw's issuance of the Formal Warning to Plaintiff. In the March 6, 2007 Formal Warning, Shaw also threatened to take "further corrective action, up to and including [Fannin's] removal from management and/or termination of employment." Doc. No. 95-14 at 3. Plaintiff also points to the fact that the 2006 meeting forming the basis for the formal warning occurred nearly nine months prior to Shaw's issuing the formal warning in 2007, and information regarding the 2006 meeting was not included in Plaintiff's 2006 Performance Evaluation.

The Court finds that genuine issues of material fact exist as to Defendants' motivation for the delay in the investigation of the incidents involving the meetings with the inspectors, the lack of counseling or inclusion of the incident in Plaintiff's 2006 evaluation, and Shaw's threats to "remove"

or "terminate" Plaintiff from management or employment. Both parties' Motions for Summary Judgment are **DENIED** on the 2007 Formal Warning[10].

3. *Thirteen Month Review Period*

Plaintiff also claims that he was discriminated against by being reviewed on a thirteen-month period rather than a twelve-month period. Defendants' undisputed evidence is that, under the applicable Salary Planning Guidelines, managers had discretion over both the amount of the raise to award employees and the timing of that raise. Doc. No. 94-2 at 2-7, Ainsworth Decl. ¶3, Ex. 1. Although Fannin usually received pay raises at 12-month intervals, his 2005 raise was scheduled for 13 months after his 2004 raise. Doc. No. 94-2 at 2-7, Ainsworth Decl. ¶7. Three of the seven other Manager I's (Donald Unsworth, Jon Blitch, and Paul Hollis) in Shaw's organization also waited 13 months for their 2005 pay raise. Doc. No. 94-2 at 2-7, Ainsworth Decl. ¶7. Plaintiff's claims that the thirteen-month review period was discriminatory fail in the face of Defendants' uncontroverted evidence that similarly-situated Manager I's under Shaw were treated the same way. Plaintiff's motion for Summary Judgment as to this issue is **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED**.

4. *Unsanitary Conditions/Denial of Office Space*

Defendants seek summary judgment on Plaintiff's claim that he was improperly denied his former office space and/or forced to work in "unsanitary conditions" when assigned to work in two offices in the "Old Annex." Plaintiff contends that after Plaintiff's return to USA in 2003, he was directed by Shaw to work in what he characterizes as an "unsanitary" Processing Facility Room ("Old Annex") "until further notice." Doc. No. 95. Plaintiff contends that, although he submitted various

---

[10]Given the Court's resolution of this issue, it is unnecessary to address Plaintiff's argument that Defendants' Motion for Summary Judgment as to the intentional discrimination should be denied because not all discovery has been completed. Doc. No. 105.

complaints regarding the mold and poor air quality in his office space, he was directed to remain in the Old Annex Process Facility Room as his office. Doc. No. 95. Plaintiff points to two reports from an investigation conducted by the Kennedy Space Center Comprehensive Health Systems Industrial Hygiene Office which ultimately revealed dust deposition, insect/animal body parts and droppings, dried mold on HVAC diffusers, dried water damage on ceiling tiles; and fungal growth. However, only the March 18, 2008 Report (Doc. No. 95-18 at 8-16) is relevant, and not an earlier air quality report, dated October 19, 2007 (Doc. No. 95-18 at 1-7), which is for Room A210 in the Processing Facility Old Annex – a room to which Plaintiff was never assigned (Shaw Decl. Doc. No. 106-3 ¶ 4). It is undisputed that the two offices to which Plaintiff was assigned – Rooms A211A and 2153H – are addressed only in the March 18, 2008 Report (hereinafter (the "CHS Report")). Plaintiff also argues that at least one other employee complained regarding the level of mold which industrial health expert Dr. Kenneth Meyers described as "unsatisfactory." Doc. No. 95-20, Meyers Dep., August 20, 2008, at 14-20. However, as Dr. Meyers testified, that employee complained as set forth in the 2008 report about missed work due to "suspected poor indoor air quality." Doc. No. Doc. No. 95-20, Meyers Dep. at 16. Plaintiff points to no evidence of *his* own complaints to Defendants about the air quality.

Defendants cite to a different portion of the March 2008 CHS Report which indicates that: (1) while "light dust deposition and insect droppings were observed, [s]ome dust and debris accumulation is common in all [KSC] facilities"; (2) "[i]ndoor mold levels are normally found to be, at a minimum, less than 50% of outdoor levels," and in Fannin's former offices the ratios were at or well within those normal levels – i.e., 6.8/13.6 (50%) and 1.8/13.6 (13%); and (3) any stains on unreplaced ceiling tiles may have been caused by roof leaks much earlier in the 2004 hurricanes, a "moisture source could not be found, and . . . no visible signs of mildew were observed," and "the water sources have been

properly sealed and water intrusion has been stopped." Doc. No. 95-18 at 11–14 (March 2008 CHS Report at 4-7).

Defendants argue that the CHS Report did not find any out of the ordinary "unsafe or unsanitary" conditions, that the conditions are common to facilities on Kennedy Space Center, that Plaintiff shared both Old Annex offices with other employees, and that other non-military USA employees continue to occupy the offices. Doc. No. 106-3, Shaw Decl. ¶ 4. Defendants argue that Plaintiff cannot claim that his office assignments were impermissibly motivated in the face of all similarly-situated employees who were assigned to the same office space and who were never in the military.

Under the facts of this case, Defendants' final argument is the most persuasive – that the March 2008 CHS Report evaluating Plaintiff's Old Annex offices – was not even *initiated* until February 8, 2008, well after Plaintiff began a year-long leave of absence in May 2007. *See* Doc. No. 95-18 at 8. There is no evidence, expert or otherwise, of the condition of the offices at the time Plaintiff was assigned to them between December 2003 to May 2007, prior to February 8, 2008. Nor has Plaintiff presented any evidence that the Old Annex location was one – as he characterizes it – "not appropriate to the level of seniority he enjoyed before his deployment," as Plaintiff has argued in his Motion for Summary Judgment. Doc. No. 95. Moreover, reassignment to a different office or sharing office space has been held to be *de minimis* or intangible aspect of a job and not an adverse employment action under analogous employment discrimination statutes. *See, e.g., Wooten v. St. Francis Med. Ctr.*, 108 Fed. Appx. 888, 891 (5th Cir. 2004) (assignment to a "less desirable office" does not constitute an adverse employment action); *Montgomery v. Maryland*, 266 F.3d 334, 341-42 (4th Cir. 2001) (court found that employer had not violated the FMLA when upon return from leave the employee no longer had her own office and had to share space), *vacated on other grounds*, 535 U.S.

1075 (2002); *Hillstrom v. Best Western TLC Hotel*, 265 F.Supp.2d 117, 127 (D. Mass. 2003) (court "cannot believe that Congress, in enacting the FMLA, intended to make a federal case out of office space"), *aff'd*, 265 F. Supp.2d 117 (1st Cir. 2003). On the issue of Plaintiff's office reassignment, Defendants' Motion for Summary Judgment is **GRANTED**.

     5. *Plaintiff's Termination following his medical leave of absence*

Plaintiff alleges that as "a direct result" of Defendants' "intentional harassment and discrimination" he left his job at USA in 2007. Doc. No. 95 at 2. Defendants move for summary judgment, arguing that Plaintiff was terminated after he took a medical leave in 2007, and when he did not return from medical leave after 12 months, as required under USA's leave policies, he was terminated.

The uncontroverted evidence is that Plaintiff went on a medical leave of absence[11] on May 8, 2007, and remained on medical leave until the time he was terminated, in accordance with USA's limit of 12 months for all leaves (excluding workplace injuries). Doc. No. 94-4 at 37-53, Sledge Decl. ¶ 12. Plaintiff has pointed to no evidence to the contrary in either his Opposition or his Motion, other than his bald assertion that his medical leave was "a direct result" of discriminatory conduct; in fact, Plaintiff has not pointed out any evidence as to the nature of his medical leave. *See* Doc. No. 105 (no mention of the termination); Doc. No. 95 (brief reference to "ignominious termination" at 17 with no citation to evidence).

Plaintiff's "wrongful termination" theory has evolved. The Amended Complaint (Doc. No. 33) appears to describe a possible claim for constructive discharge. But Plaintiff has never offered evidence in support of this theory. In Plaintiff's Response to Defendants' Motion in Limine, Plaintiff

_____

[11]Plaintiff repeatedly tries to draw some distinction between being ill rather than disabled with respect to this leave period. The difference, if any, is immaterial here. Plaintiff took medical leave, did not return to work, and was terminated. The medical basis and its permanency do not enter the analysis.

states: "The truth is that Plaintiff became ill after working in the unsanitary office provided for him by USA managers and that he left on medical leave soon thereafter.  His departure had nothing to do with any form of disability.  Plaintiff was forced to leave work at USA due to the illness created by the unsanitary working conditions Plaintiff was assigned to by Shaw in retaliation for his attempts to enforce his rights under USERRA."  Doc. No. 140 at 7.  Even under this belatedly-advanced theory, Plaintiff has pointed to *no* evidence that he went out on medical leave due to a condition in his office, or even that there were "unsanitary" conditions in the office at the time he worked there.  If Plaintiff is now claiming that USA caused his health to deteriorate to the point he could not work, he has provided neither factual nor medical evidence to substantiate the claim. Defendants' Motion for Summary Judgment on this issue is **GRANTED.**

## ORDER ON DISCOVERY MOTION AND MOTIONS IN LIMINE

Based on the Court's rulings on the matters raised in the parties' Motions for Summary Judgment, the Court rules as follows:

| | |
|---|---|
| **MOTION:** | **MOTION IN LIMINE [CONCERNING DEFENDANTS' REVISED INITIAL DISCLOSURES] (Doc. No. 96)** |
| **FILED:** | **October 10, 2008** |
| _____ | |
| **THEREON** it is **ORDERED** that the motion is **DENIED** as moot. | |

Plaintiff challenges Defendants' revised disclosures and production of USA's leave policies and CIGNA records for Plaintiff's medical benefits.  Because the Court has granted summary judgment to Defendants on Plaintiff's USERRA claims relating to his termination and reimbursement of medical benefits, discovery issues related to these documents is now moot.

<table>
<tr><td><strong>MOTION:</strong></td><td><strong>DEFENDANTS' MOTION FOR SANCTIONS [FOR PLAINTIFF'S FAILURE TO PROVIDE ANSWERS AND CONDUCT DURING DEPOSITION] (Doc. No. 102)</strong></td></tr>
<tr><td><strong>FILED:</strong></td><td><strong>November 6, 2008</strong></td></tr>
</table>

**THEREON** it is **ORDERED** that the motion is **DENIED** as moot.

Defendants argue that despite a court order instructing Plaintiff to provide further discovery responses and sit for an additional 2.5 hours of deposition, *see* Doc. No. 83, Plaintiff merely certified that his original responses were full and complete "when originally served."  Doc. No. 102 at 5. Defendants argue that the declarations of Plaintiff and his counsel do not provide any detail of the nature of the reasonable inquiry or specific effort made to obtain the information.  Plaintiff (and his counsel) will be bound by and limited to Plaintiff's sworn responses to interrogatories and other discovery responses at trial, and no sanctions are due to be awarded.

Defendants also seek sanctions for Plaintiff's failure to provide the documents relating to his disability claims.  The Court has granted Defendants' motion for summary judgment on Plaintiff's claims relating to his medical leave and termination; therefore, issues of discovery relating to his termination or claims for front pay are now moot.

Defendants also contend that Plaintiff's counsel's conduct at the court-ordered deposition continued to violate the Court's discovery orders.  Doc. No. 102 at 12-15.  While counsel's conduct pushes the envelope of what is allowed under the Court's rules of decorum, no sanctions will be awarded at this time.  However, Mr. Aucoin is cautioned that he will be expected to follow the Middle District of Florida's Local Rules of Courtroom decorum **to the letter** at trial, particularly Local Rule 5.03(b)(7) which requires that counsel "[a]void disparaging personal remarks or acrimony toward opposing counsel and remain wholly detached from any ill feeling between the litigants or witnesses"

and Rule 5.03(b)(12): "In making objections counsel should state **only** the legal grounds for the objection and should withhold all further comment or argument unless elaboration is requested by the Court." Sanctions will be awarded for failure to abide by these Rules during the trial.

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION IN LIMINE [RE: PLAINTIFF'S DISABILITY, PAIN AND SUFFERING DAMAGES, FACT WITNESS AND PHYSICIAN TESTIMONY, AND "POINT PAPER"] (Doc. No. 133)** |
| **FILED:** | **December 31, 2008** |

**THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** as moot in part as set forth below.

Defendants seek to exclude any of Plaintiff's evidence of damages for the period after the onset of his disability on May 8, 2007. Defendants also seek to exclude lay witness opinions or those of Plaintiff's non-expert treating physicians that Plaintiff may use to support medical causation for his theory that the so-called "unsanitary" office space caused him to take a medical leave. This issue is mooted by the Court's granting of summary judgment to Defendants' on Plaintiff's USERRA claims relating to his "unsanitary" office space and termination claims; therefore, any evidence related to these claims is now moot.[12]

Defendants also seek to exclude Plaintiff's evidence of damages for pain and suffering allegedly caused by violations of the USERRA. As set forth in the Court's ruling on summary judgment, Plaintiff's remedies under the USERRA are limited to compensatory damages for lost wages or benefits and liquidated damages. *See* 38 U.S.C. § 4323(d). Plaintiff offers no authority to

_____

[12]Likewise, the Court need not reach the question of whether Plaintiff is estopped from seeking front pay based on his having asserted that he was entitled to long term disability insurance benefits and social security disability benefits. Plaintiff obviously would not be eligible for lost pay for any period he would have been unable to work. He has been vague, if not cryptic, in describing his claims to disability benefits in administrative and judicial proceedings, asserting only that he has not been adjudicated as disabled. This begs the question as to the effect of his having *claimed* to be disabled.

the contrary. Therefore, evidence concerning any other form of damages is inadmissible and the Motion in Limine is **GRANTED** on this issue.

Defendants seek to exclude testimony from some of Plaintiff's co-workers. Fellow employees who observe events in the workplace that materially bear on relevant issues may testify to those matters. When a case involves issues such as managerial skills and communication abilities the boundary for such testimony is harder to define. The Court will not categorically exclude such testimony prior to trial. The witnesses will not, however, be permitted to relate their claims of alleged discrimination nor their opinions as to whether Plaintiff was treated fairly.

The "water cooler talk" proffered from Mr. Jacobs is vague to the point of meaninglessness. Even if its meaning could be reliably discerned, it is hearsay, not subject to any exception.

Defendants finally object to Plaintiff's planned use of his "point paper," a 21 page document written by Plaintiff as a "diary" of his claims of mistreatment by USA over the years. This document plainly is hearsay, and the exceptions cited by Plaintiff do not apply to allow its admission as evidence. Whether the document might qualify to be used to refresh the plaintiff's memory or as a recorded recollection will have to await trial, though such assistance is rarely needed by an articulate witness guided by appropriate questioning from his own counsel.

## CONCLUSION

The Court **GRANTS** summary judgment to Defendants (Doc. No. 93) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. No. 95) on Plaintiff's claims that Defendants violated USERRA: by not reemploying Plaintiff as a Manager II; by placing Plaintiff in unsanitary work spaces; by terminating him following a medical leave in May 2008; by placing him in a thirteen month review period; failing to pay him merit pay raises while on military leave. The Court also **GRANTS** Defendants' Motion for Summary Judgment (Doc. No. 93) to the extent Plaintiff has

alleged claims that Defendants violated USERRA by: failing to buy back Plaintiff's vacation benefits; charging Plaintiff for medical plan costs while he was on military leave; and failing to move Plaintiff to a lateral position or to select him over other candidates for specific Manager II positions; failing to keep Plaintiff informed of departmental issues and non-responsiveness to his queries; failing to notify him of meeting cancellations; attempting to move him to first shift for mentoring and coaching; delaying delivering of his paychecks; failing to allow Plaintiff to participate in the Green Belt Training program while he remained a manager, and failing to give Plaintiff a departmental mailbox until three months after his return.

Plaintiff's Motion for Summary Judgment (Doc. No. 95) is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED** on Plaintiff's claim that Defendants failed to reemploy him in a position of "like seniority, status, and pay" as a Manager I from August 2003 to December 2003 in violation of § 4312 of the USERRA. However, there remains the issue as to whether Plaintiff is entitled to *any* damages as a result of the three-month delay in returning him to the Manager I Position.

Plaintiff's Motion for Summary Judgment and Defendants' Motion for Summary Judgment are both **DENIED** and genuine issues of material fact remain for trial on Plaintiff's claims that Defendants violated USERRA, 38 U.S.C. § 4211: by providing a "2" on Plaintiff's 2004 Performance Review and by providing Plaintiff with a Formal Warning in 2007. It remains unclear what damages recognized under the statute, if any, Plaintiff believes he can prove in connection with these events. As stated at the Final Pretrial Conference, the parties are ordered to file an amended joint Final Pretrial Statement, reflecting the narrowed issues as set forth herein, **by January 29, 2009**. In that document, Plaintiff shall specifically address what damages that are allowed by the statute he believes he will prove as to the matters still in issue.

**DONE** and **ORDERED** in Orlando, Florida on January 20, 2009.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record