# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**GLENN SCOTT FANNIN,**

        **Plaintiff,**

**-vs-**                        **Case No. 6:07-cv-1315-Orl-DAB**

**UNITED SPACE ALLIANCE, L.L.C.,**
**d/b/a: USA, and ZARAH P. SHAW,**

        **Defendants.**

_____

## MEMORANDUM OF DECISION

This cause came on for trial before the undersigned[1] on February 9 through 11, 2009. For the reasons set forth below, the Court orders entry of judgment that Plaintiff take nothing from Defendants.

On August 21, 2007, Plaintiff Glenn Fannin filed this Complaint against his former employer, Defendant United Space Alliance, LLC ("USA"), and his former manager, Defendant Zarah P. Shaw, for violations of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.* ("USERRA")[2]. Doc. No. 1, 33. Following the Court's partial grant of summary judgment (Doc. No. 143), Plaintiff's claims were narrowed to three remaining triable issues: (1) whether Defendants discriminated or retaliated against Plaintiff by giving him a mark of "2" on a 2004 Performance Appraisal; (2) whether Defendants discriminated or retaliated against Plaintiff in giving him a Formal Warning in 2007; and (3) what damages, if any, Plaintiff suffered when

---

[1] This case was originally assigned to Chief Judge Conway; following the parties' consent the case was reassigned February 5, 2008. Doc. No. 38.

[2] Although Plaintiff asserted claims in the Amended Complaint (Doc. No. 33 ¶¶ 28, 29) for violation of the Florida Uniformed Servicemembers Protection Act ("FUSPA"), Fla. Stat. § 250.80 et seq., these claims were dismissed on summary judgment. *See* Doc. No. 143.

Defendants failed to immediately return Plaintiff to his pre-leave position for three months, where he still received the same pay and benefits as in his former Manager I position.

Defendants deny Plaintiff is entitled to recover any damages from the three-month delay in restoring Plaintiff to the Manager I position. Defendants also contend they would have given Plaintiff the same 2004 performance appraisal and 2007 warning without regard to Plaintiff's military service and/or his complaints about his return-to-work position.

At trial, Plaintiff offered his own testimony and that of Dr. Stan Smith, Gerald Jacobs, Harry Prosser, Kitty Connery, David Ashwell, Elizabeth Muldowney, Patricia Stratton, Gary Wright, Ralph Shivel, Sandra Ritchie, William Pickens, and the testimony of Defendant Zarah Shaw. Defendants offered the testimony of David Day and Herminio Morales. Based on this testimony and the exhibits admitted into evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## *FINDINGS OF FACT*

USA is the prime contractor to the National Aeronautics and Space Administration ("NASA") for the operation of the space shuttle program, and is responsible for a broad range of technical and support functions to prepare the shuttle for launch. Plaintiff began working for USA's predecessor as a lead electronic shuttle technician in 1996, and transferred to a Pad Leader position in 1998. In August 2001, USA promoted Plaintiff to second shift Manager I in Orbiter Operations Quality Assurance ("Manager I") where Plaintiff had approximately forty-two subordinates reporting directly to him.

Late on September 11, 2001, Plaintiff received active duty orders to serve at the Jacksonville International Airport in Jacksonville, Florida. Prior to his employment with USA, Plaintiff had served as an active duty noncommissioned officer in the U.S. Air Force and in 1989, continued his military

service as a reservist non-commissioned officer with the Florida Air National Guard; he received his commission as an officer in 1996.

During Plaintiff's two-year military leave, USA needed someone to take over his Manager I duties. To open a Manager I slot, USA reclassified Plaintiff as an Ops & Processing Staff V ("Staff V Position") – a lateral move – on January 8, 2002. The Staff V position was the same pay grade/band as the Manager I position, which meant there was no change in pay or benefits. There was also no difference in seniority or status between the two positions.

Ralph Shivel, who had previously served as a Manager I in Quality Assurance, was selected to take over the Manager I position vacated by Plaintiff. As to Plaintiff's other benefits, during his military leave of absence, USA revised its leave of absence policy in order to support its absent reservists, and offered to pay those employees the difference between their military pay and their USA pay for up to 24 months during their activation. This resulted in Fannin being paid more than $29,000 by USA during his 2001-2003 leave, plus full benefits.

In late August 2003, Plaintiff was honorably discharged from active duty service and he requested to return to employment with USA. Plaintiff did not learn of the shift in his position from Manager I to Staff V until his return from active duty; at that time he was reinstated to the Staff V Operations Position, not to the Manager I Position on the second shift[3]. In August 2003, right before Plaintiff returned to USA, Shaw designed an organizational chart that showed Shivel and Plaintiff both as Manager I's with the subordinates split between them rather than under just one Manager I. Patricia Stratton the Department Director told Shaw that Plaintiff could not be a manager because

---

[3]Second shift worked from 3:30 p.m. to midnight.

there was "no slot for him" and he was to remain in the Staff V Position[4]. Stratton decided to keep Plaintiff at the Staff V position rather than return him to the Manager I Position because in her opinion it "did not make business sense to displace Shivel to give Plaintiff his job"; Shaw could not have overruled Stratton, as she was his superior. David Ashwell (Director of Human Resources) believed the Staff V position "was comparable" to the Manager I position.

Shaw told Plaintiff around October 2003 that the decision had been made (by others) not to return Plaintiff to his Manager I position. Plaintiff received the same pay and benefits in the Staff V Position as he would have in the Manager I position; however, he had no subordinates reporting to him for the three months before he was reinstated to a Manager I position. In November 2003, Plaintiff complained to an outside group, Employer Support of the Guard and Reserve, and internally within USA about the failure to return him to the Manager I position. On December 6, 2003, USA reinstated Plaintiff to the second shift Manager I position. In order to reinstate Plaintiff to the second shift Manager I position it was necessary for Shaw to simultaneously remove another employee, Ralph Shivel, from that Manager I position. Shivel was subsequently promoted to manager about one month later.

Prior to Plaintiff's military deployment, Plaintiff received marks of "3 (meets expectations)" or better in every evaluated category. Elizabeth Muldowney (Plaintiff's pre-leave manager) rated Plaintiff a 3.0 for his performance as a Manager I in 2001. Approximately one year after Plaintiff's return to USA and his reinstatement to Manager I in December 2003, Shaw prepared a performance review for Plaintiff, and rated him a "3" (meets expectations) in all fourteen categories except in Communications (Verbal and Written). Shaw gave Plaintiff a "2" (partially meets expectations) in

---

[4] In mid-2004 that Shaw initiated discussions with upper management about dividing up Plaintiff's subordinates into two groups because of the large number of subordinates to manage. Shaw promoted another employee, Mr. Unsworth, whom Plaintiff recommended for the promotion.

-4-

the Communications category based on the feedback he received from Shaw's inspectors, and his own interactions with Plaintiff. For example, Plaintiff's subordinates (who were geographically spread out at separate locations several miles apart) complained that they could not reach him because he did not have his own phone line from May 2004 to December 2004 and he had to rely on a pager. The reason Plaintiff had no office phone was because he failed to take the steps to get one installed although Shaw had told him to move his office months earlier; in Shaw's opinion, it should have only taken one week to get the phone and computer moved once requested. Instead, Plaintiff had initially gone to Human Resources to complain[5] once Shaw told him to move offices and had refused to move for months. Ms. Ritchie, Shaw's assistant, offered to assist Plaintiff on dealing with the move but he never took her up on it. Shaw finally told Plaintiff that he had run out of time to resist the move because the other employee would be moving in that day after Shaw's shift. Instead of moving his office right away, Plaintiff responded that he was going to see Human Resources (presumably to complain or appeal the decision), and he was told by Human Resources that he did indeed have to move.

Additionally, although Plaintiff disagreed with Shaw's "2" assessment he did not do or say anything about his disagreement, but just went along and tried not to create other problems while his complaint was being handled by the Department of Labor. Plaintiff's overall performance score was a 2.9 for 2004 and he received a 4% pay raise, consistent with prior and subsequent raises with higher marks; Plaintiff lost no pay or benefits as a result of receiving a "2" in one of fourteen categories on his 2004 performance appraisal.

Three years later in March 2007, Plaintiff received a Formal Warning from Shaw arising from an incident from 2006 in which Plaintiff met with three of his quality inspectors, following Shaw's

---

[5]Plaintiff had a long list of other complaints which were submitted to Human Resources as well.

direction to make sure the inspectors finished their cross training to assist in the Thermal Protective System ("TPS") area. Plaintiff called into his office the three quality inspectors, David Day, Herminio Morales, and William Pickens, shut the door and turned up the television (which was set to a music station) in case "someone had a listening device." In an angry fashion, he instructed the inspectors not to talk while he lectured them to get their on the job training completed or face termination of their employment; the inspectors initially did not say anything to Shaw because Plaintiff insinuated Shaw knew about the substance of the meeting.

Months later, in early 2007, Pickens mentioned the meeting to Shaw's administrative assistant, Sandra Ritchie, who reported the incident to Shaw, who then asked Human Resources to investigate. During the investigation, the Human Resources representative also uncovered that, in a group meeting, Plaintiff had confronted his inspectors with negative feedback some of them submitted during USA's anonymous "multiple input review" process (in which subordinate employees can submit feedback on their managers). Shaw, with input from Human Resources, drafted a Formal Warning[6] to Plaintiff dated March 6, 2007 which recounted the incidents and stated that for "future occurrences," Shaw would take "further corrective action, up to and including [Plaintiff's] removal from management and/or termination of employment." Doc. No. 95-14 at 3. The Formal Warning went in Plaintiff's employee file, but would be removed from the file upon the expiration of one year if the behavior was corrected. There was no reduction to compensation or benefits.

Plaintiff went on a medical leave of absence on May 8, 2007 and remained on medical leave until his termination from employment on May 7, 2008.

---

[6] In his career as a manager, Shaw has written three dozen formal warnings.

## *CONCLUSIONS OF LAW CONCERNING THE USERRA*

The Uniformed Services Employment and Reemployment Rights Act was enacted to "prohibit employment discrimination on the basis of military service" and to provide "prompt reemployment" to individuals engaged in non-career military service. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301). Because the purpose of USERRA is "to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312-13 (4th Cir. 2001). USERRA's right to re-employment encompasses two guarantees that are embodied in §§ 4312 and 4313. Under § 4312, returning military personnel who (a) gave advance notice of military leave to their employer; (b) were on a military leave of less than five years; and (c) submitted a timely request for reemployment "shall be entitled" to reemployment. 38 U.S.C. § 4312. Section 4313 sets forth the position of employment to which the returning veteran must be rehired and requires that the veteran be "promptly reemployed" in that position. *See Petty v. Metropolitan Government of Nashville-Davidson County*, 538 F.3d 431, 440 (6th Cir. 2008) (employer violated USERRA in not reemploying veteran promptly during three-week unpaid period during which he was tested for fitness to return to work as a police officer), *pet. cert. filed,* 77 USLW 3442 (U.S. Jan.28, 2009) (No. 08-965).

A different section of USERRA "prohibits employers from discriminating against employees on the basis of military service." 38 U.S.C. § 4311. A violation occurs when a person's military service is a "motivating factor" in the discriminatory action, even if it is not the sole factor. 38 U.S.C. § 4311(c)(1). Under § 4311, plaintiff bears the initial burden of showing by a preponderance of the evidence that (1) the defendant has denied him "initial employment, reemployment, retention in employment, promotion, or any other benefit of employment," and (2) plaintiff's military service

was "'a substantial or motivating factor' in the adverse employment action." *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (cited with approval in *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301)). The USERRA provides that, even if prohibited discrimination is a factor, the employer does not violate the statute if "the employer can prove that the action would have been taken in the absence of [military status]." 38 U.S.C. § 4311(c)(1).

Plaintiff also alleges USA retaliated against him for exercising his rights under the USERRA. An employer may not discriminate in employment or take adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under the USERRA or has exercised a right provided for in the USERRA. 38 U.S.C. § 4311(b).

The Court previously ruled that Defendants were entitled to summary judgment on Plaintiff's claims that the following conduct violated the USERRA: USA's failure to buy back Plaintiff's vacation benefits; USA's charging Plaintiff for medical plan costs while he was on military leave; USA's failure to move Plaintiff to a lateral position or to select him over other candidates for specific Manager II positions; Shaw's failure to keep Plaintiff informed of departmental issues and non-responsiveness to his queries; Shaw's failure to notify him of meeting cancellations; Defendants' attempts to move him to first shift for mentoring and coaching; Defendants' delays in delivering his paychecks; Defendants' failure to allow Plaintiff to participate in the Green Belt Training program while he remained a manager; Defendants' failure to give Plaintiff a departmental mailbox until three months after his return; Defendants' assignment of Plaintiff to different work spaces that Plaintiff contended were "unsanitary"; and Defendants' "forcing" Plaintiff to leave his job at USA in 2007. The Court also granted summary judgment to Defendants on Plaintiff's contentions that he was entitled to merit pay while on leave, that changing Plaintiff's review period from twelve months to

thirteen was discriminatory, and that he was entitled to a promotion from Manager I – a position he held for only one month before his military leave began – to Manager II upon reemployment. See Doc. No. 143. Three issues remained for trial, which relate to (1) Plaintiff receipt of a mark of "2" on a 2004 Performance Appraisal and (3) receipt of a 2007 Formal Warning; and (3) the extent of damages (if any) Plaintiff suffered when Defendants failed to immediately return Plaintiff to his pre-leave position for three months.

**A. Section 4312 - Right to reemployment in a position of like seniority, status, and pay**

Plaintiff claims USA should have immediately reemployed him in the Manager I Position, and should not have reassigned him to a Staff V Position, delaying for three months his reassignment to the Manager I Position. In order to prove a claim under § 4312, Plaintiff must show that he has fulfilled the procedural requirements of § 4312 and that the defendant's offered position violated the requirements of § 4313. In this case, the parties do not dispute that Plaintiff complied with the procedural requirements of § 4312 and was entitled to reemployment; rather, the parties dispute whether Plaintiff was placed into an appropriate escalator position, *i.e.*, one of "like seniority, status, and pay." A key provision of USERRA's reemployment protections is the "escalator principle," which "requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service." 20 C.F.R. § 1002.191.

However, an employer is permitted to take into consideration changes in the workplace during an employee's period of military leave. The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification he would have held if he had been employed during his period of military service. See 20 C.F.R. § 1002.194 ("The reemployment position may

-9-

involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.").

The "[b]urden of proving that a returning veteran is not qualified for reemployment falls on the employer, not on the employee." 38 U.S.C.A. § 4313; *Petty v. Metropolitan Government of Ashville-Davidson County*, 538 F.3d 431, 444 (6th Cir. 2008), *pet. cert. filed,* 77 USLW 3442 (U.S. Jan.28, 2009) (No. 08-965). The Court is to consider six factors in evaluating if an offered position for reemployment is of like status: (1) opportunities for advancement (2) general working conditions (3) job location (4) shift assignment (5) rank and (6) responsibility. 20 C.F.R. § 1002.194. The Court must also consider whether seniority is the same. 20 C.F.R. § 1002.193.

The Staff V Position was the same pay grade as the Manager I position, without any change in pay and benefits, thus, Plaintiff suffered no lost wages during the three-month period in dispute; he received the same pay and monetary benefits that he would have received in a Manager I position. The seniority and status were also the same.

The Court previously granted summary judgment to Plaintiff on his claim that his reemployment for three months, from August 2003 to December 2003, at the Staff V Position violated § 4312 because there were significant differences in the rank and responsibility (such as no subordinates reporting to him), as well as the advancement opportunities, between the Manager I and Staff V Positions. *See* Doc. No. 143. However, the Court expressed doubts in the summary judgment order (Doc. No. 143) whether Plaintiff was entitled to any damages as a result of the three-month delay in returning him to the Manager I Position.

The Court previously pointed out that Plaintiff's remedies under the USERRA were limited to compensatory damages for lost wages or benefits, and liquidated damages[7]. The legislative history of the USERRA makes clear that § 4313 requires prompt reinstatement: "The Committee recognizes that what is prompt depends on the circumstances of each case. . . . reinstatement after weekend National Guard duty would, in most cases, be the next scheduled working day, while reinstatement after five years on active duty may require giving notice to an incumbent employee who may have to be 'bumped.' The Committee intends that any undue delay in reinstatement would be subject to a claim for lost wages." H.R.Rep. No. 103-65, pt. 1, at 32 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2465. *See also Rogers v. City of San Antonio*, 392 F.3d 758, 763 (5th Cir. 2005) (prompt reinstatement after "several years of active duty may require more time, because the employer may have to reassign or give notice to another employee who occupied [the] position.")(quoting 20 C.F.R. pt. 1002); *Haight v. Katch, LLC,* Case No. 4:04cv3363, 2005 WL 1221205, *4 (D. Neb. May 20, 2005) ("prompt reemployment" may mean anything from reinstatement during the next scheduled shift to reinstatement two weeks after the application for reemployment-or even later-depending upon the circumstances).

At trial Plaintiff produced no evidence of *any* monetary damages specifically related to the three-month delay in reinstating him to his former Manager I position. Moreover, it appears unlikely that monetary damages would arise out of the relatively brief delay in reinstatement to a management role, where there was no impact on salary or benefits, and Plaintiff was not able to tie the three-month delay to any other decisions made by USA. *Maher v. City of Chicago*, 406 F.Supp.2d 1006, 1026 (N.D. Ill. 2006) (where reservist was ultimately reinstated to his former position, and apparently suffered no financial damage as a consequence of any delay in reinstatement, "the chief utility" of the

---

[7]*See* 38 U.S.C. § 4323(d). Injunctive relief is also available, but inasmuch as Plaintiff was reinstated to Manager I in December 2003, prior to filing the lawsuit, this remedy is not pertinent here.

incident was "its evidentiary value in the overall mix of claimed misconduct"), *aff'd,* 547 F.3d 817 (7th Cir. Oct. 31, 2008).

Plaintiff shall take nothing from Defendants for his claim to reinstatement.

### B. Section § 4211 – Discrimination against servicemembers

Plaintiff contends that Defendants discriminated and retaliated against him because of his military service. Defendants argue that Plaintiff has provided no evidence that the single 2004 performance appraisal "2" score or the 2007 "Formal Warning," were impermissibly motivated or had a material adverse impact on his employment in any way. Defendants argued at trial that there is no evidence that Plaintiff's military service was a motivating factor in any adverse employment action and that they would have made the same decisions under the circumstances.

To succeed under § 4211, Plaintiff must prove, by a preponderance of the evidence, that his military service motivated the denial of employment benefits. *Sheehan v. Dept. of Navy*, 240 F.3d 1009 (Fed. Cir. 2001). The allocation of burdens is included in the statute and differs from the *McDonnell Douglas* framework:

> An employer shall be considered to have engaged in actions prohibited . . . if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C.A. § 4311(c)(1). This procedural framework is different from *McDonnell Douglas*, because while allocating the burden of production of evidence, "it does not shift the burden of persuasion to the employer." *Sheehan*, 240 F.3d at 1014. The burden-shifting framework applied in *Sheehan* is the method used to discern whether an employer was, in fact, motivated by the employee's military status when he or she was denied the benefit of employment. *Id*. at 1014 (quoted in *Coffman v. Chugach*

*Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005)); *see also Sanguinetti v. United Parcel Service, Inc.*, 114 F.Supp.2d 1313 (S.D. Fla. 2000), *aff'd*, 254 F.3d 75 (11th Cir. 2001) (table).

This technique mandates that the plaintiff first must show by a preponderance of the evidence that military status was a motivating factor in the employer's decision to discharge or adversely affect an employee. *Coffman*, 411 F. 3d at 1238. "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* (quoting *Sheehan*, 240 F.3d at 1014). The burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.*

*1. "Negative" Performance Review in 2004* – Plaintiff alleged at trial that Defendants discriminated against him because they resented Plaintiff's enforcement of his right to reinstatement to the Manager I position.[8] Specifically as to Defendant Shaw, Plaintiff alleged that Shaw resented Plaintiff for forcing the reinstatement issue and requiring Shaw to remove Ralph Shivel, Shaw's friend, from the Manager I position and replace him with Plaintiff. The testimony at trial was to the contrary.

As to the corporate entity, USA went to great lengths to provide additional benefits to its employees on military leave, by continuing benefits and by providing a differential pay between an

---

[8]As the Court noted at the summary judgment stage, it was not Plaintiff's status as a service member that is the root of the discrimination Plaintiff alleges, it was Plaintiff's exercise of his rights under the USERRA in demanding to be returned to a Manager I Position against which Defendants allegedly retaliated.

-13-

employee's military pay and their USA salary. Differential pay to Plaintiff amounted to at least $29,000.

Shaw individually did not show any retaliatory motive. In August 2003, right before Plaintiff returned to USA, Shaw designed an organizational chart that showed Shivel and Plaintiff *both* as Manager I's with the subordinates split between them rather than under just one Manager I. Shaw's proposal was vetoed by Stratton, who told Shaw that Plaintiff could not be a manager because there was "no slot for him" and Stratton did not believe it made sense in her opinion to remove Shivel and replace him with Plaintiff; Shaw could not have overruled that decision.

The personal relationship between Shaw and Shivel, upon which Plaintiff relies to establish a motive, was not shown to be particularly strong or close. The inference of any resulting animus is weak to the point of non-existence. Plaintiff has simply provided no factual or logical nexus between his military service (and his assertion of rights) and the performance review.

Additionally, Plaintiff has considerably exaggerated the significance of the evaluation. The "2" that Shaw gave Plaintiff on his Performance Appraisal was not a "career-ending" low mark. Shaw himself had personally received a "2" on a Performance Appraisal and had still been promoted. Betty Muldowney, Plaintiff's former supervisor and the erstwhile Manager II of Quality Assurance, also had received a "2" on a Performance Appraisal form; she believed that one "2" on an Appraisal did not mean promotion was not possible. She had also given out at least one "2" each year for the last 28 years; and no advance documentation was required. Another employee of Shaw's, Sandra Ritchie, had also received a "2" and had not been denied raises.

Finally, quite apart from any concern over Plaintiff's military status, the "2" that Shaw gave Plaintiff on his 2004 Performance Appraisal in Communications was based on substantial grounds,[9] since it took Plaintiff months to get his phone, computer, and office moved, a task that should have take a week if Plaintiff had not stubbornly resisted the move. Additionally, Plaintiff's overall score was a 2.9 for 2004, and he received 4% pay raise in the 2005 salary plan based on the 2.9. Plaintiff's proof simply fails on all aspects of this claim.

*2. Negative Performance Action in 2007 (Formal Warning)*– Plaintiff argued at trial that the Formal Warning issued to Plaintiff on March 6, 2007 – advising him of his "unacceptable performance as a member of management"–was motivated by Shaw's continuing discriminatory animus toward Plaintiff. Shaw issued Plaintiff the Formal Warning based on the complaints of Plaintiff's three quality managers and the investigation by Human Resources verifying those complaints. The inspectors consistently testified that Plaintiff's meeting with them was conducted while he was angry and serious – and not in the joking fashion he alleged. Plaintiff lectured them, threatened their jobs, and precluded them from speaking or asking questions. The inspectors did not immediately report Plaintiff's behavior to Shaw because they were intimidated and worried about retaliation. Once Shaw learned of the incident in early 2007, and asked Human Resources to investigate, Human Resources learned of Plaintiff's additional inappropriate behavior, *i.e.*, his confrontation of the inspectors with negative feedback some of they had submitted. The Formal Warning Shaw issued to Plaintiff was appropriate given Plaintiff's unacceptable behavior, and was

---

[9]Plaintiff's conduct problems could perhaps have been more accurately categorized as insubordination rather a communications problem.

not motivated by Plaintiff's military status or his exercise of his rights. Moreover, Plaintiff lost no pay or benefits because of the Formal Warning and it would have been removed after twelve months.[10]

As with the previous claim, Plaintiff has made no showing that consideration of his military status was in any way related to the decision to issue the warning. No evidence, direct or indirect, provides any linkage. The specific facts of his conduct in the meeting were in large part admitted by Plaintiff[11], both at the time and at trial. Those facts certainly justify disciplinary action, and Plaintiff has not shown that any consideration of his military status entered into the decision.

## *ATTORNEY'S FEES*

Under USERRA, prevailing service members may recover their reasonable attorney fees, expert witness fees, and other litigation expenses. 38 U.S.C. § 4323[12]. Although USA violated the re-employment requirement of USERRA for a period of three months, the Court finds that Plaintiff Glenn Fannin shall take nothing from Defendants USA and Shaw because he has failed to prove any damages recoverable under the statute. As such, Plaintiff is not a prevailing party and is not entitled to recover attorney's fees.

The Supreme Court has held that plaintiffs receiving no relief on the merits of their claims are not prevailing parties. "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that

---

[10] Plaintiff testified that he believed the Formal Warning to be the end of his career at USA. Again, Plaintiff has exaggerated the effect of actions by his employer. While obviously adverse, a Formal Warning at USA is hardly the equivalent of termination.

[11] Plaintiff disputes how loud he was speaking and tried to claim after the meeting that he was trying to be humorous. Those assertions are contradicted by the circumstances of the meeting, which Plaintiff himself depicted as of the utmost seriousness. To the extent there are discrepancies in the accounts of the meeting, the testimony of the inspectors is more credible.

[12] In any action or proceeding to enforce a provision of this chapter by a person under subsection (a)(2) who obtained private counsel for such action or proceeding, the court may award any such person who prevails in such action or proceeding reasonable attorney fees, expert witness fees, and other litigation expenses. 38 U.S. C. § 4323(h)(2).

directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). That standard can be satisfied by a "judgment for damages in any amount, whether compensatory or nominal." *Id.* at 113. Where a plaintiff does not obtain an enforceable judgment or other direct benefit, he is not entitled to fees under a prevailing party fee statute.

Note the result would be the same even if the Court were to award nominal damages for the statutory violation. Even when a plaintiff is technically a "prevailing" party on a claim, the district court has discretion to determine what constitutes a reasonable fee, a determination that requires the court to consider the extent of the plaintiff's success. *Id.* at 114 ("Once civil rights litigation materially alters the legal relationship between the parties, the degree of the plaintiff's overall success goes to the reasonableness of a fee award."). If the prevailing party has recovered only nominal damages, the Supreme Court has explained that "the only reasonable fee is usually no fee at all." *Id.* at 115. As Justice O'Connor explained in her concurring opinion, "[w]hen the plaintiff's success is purely technical or *de minimis*, no fees can be awarded. Such a plaintiff has either failed to achieve victory at all, or has obtained only a Pyrrhic victory for which the reasonable fee is zero." *Farrar*, 506 U.S. at 117 (O'Connor, J., concurring).

In this case, Fannin obtained at most a Pyrrhic victory on Defendants' failure to promptly re-employ him in his former position. Given that the proper reinstatement had occurred before the case was filed and the bulk of Plaintiff's other disagreements over his employment were the ordinary give and take of any workplace, the filing and disputatious pursuit of this litigation are dubious. The important and salutary purposes of USERRA are not well served by undue focus on trivial and unrelated issues. Under these circumstances, Plaintiff is not entitled to any award of attorney's fees.

## *CONCLUSION*

Based on the testimony at trial and the other evidence presented, the Court rules that Plaintiff take nothing against Defendants. The parties shall bear their own costs. The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on April 3, 2009.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record